## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **GAIL JANE OTEY,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:17cv00029 |
| | ) | **REPORT AND** |
| **NANCY A. BERRYHILL,** | ) | **RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Gail Jane Otey, ("Otey"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Otey protectively filed her application for DIB on October 24, 2013, alleging disability as of December 31, 2011, based on manic depression, bipolar I disorder with mixed psychotic features, back pain and burning, anxiety and sciatic nerve problems in the leg. (Record, ("R."), at 20, 187-88, 207.)[1] The claim was denied initially and upon reconsideration. (R. at 108-10, 113, 116-18, 120-22.) Otey then requested a hearing before an administrative law judge, ("ALJ"). (R. at 123.)

By decision dated August 31, 2016, the ALJ denied Otey's claim. (R. at 20-32.) The ALJ found that Otey met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 22.) The ALJ found that Otey had not engaged in substantial gainful activity since December 31, 2011, the alleged onset date.[2] (R. at 22.) The ALJ found that the medical evidence established that Otey had severe impairments, namely degenerative disc disease, degenerative joint disease of the left shoulder, hiatal hernia and depression, but he found that Otey did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

---

[1] Otey alleged an earlier date of disability in her application, but later amended the date to December 31, 2011. (R. at 187-89.)

[2] Therefore, Otey must show that she was disabled between December 31, 2011, the alleged onset date, and August 31, 2016, the date of the ALJ's decision, in order to be eligible for benefits.

Subpart P, Appendix 1. (R. at 22-24.) The ALJ found that Otey had the residual functional capacity to perform simple, routine light work that required no more than occasional climbing of ramps and stairs, kneeling, stooping, crouching and crawling, that did not require climbing ladders, ropes or scaffolds and that required no more than occasional interaction with the public, co-workers and supervisors.[3] (R. at 24-30.) The ALJ found that Otey was unable to perform her past relevant work as a welder, a salvage yard laborer, an assistant manager and a receptionist. (R. at 30.) The ALJ further found that a significant number of jobs existed in the national economy that Otey could perform, including jobs as a packing line worker, a night cleaner and an assembler. (R. at 30-31.) Thus, the ALJ concluded that Otey was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 31-32.) *See* 20 C.F.R. § 404.1520(g) (2018).

After the ALJ issued his decision, Otey pursued her administrative appeals, (R. at 186), but the Appeals Council denied her request for review. (R. at 1-5.) Otey then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2018). This case is before this court on Otey's motion for summary judgment filed January 4, 2018, and the Commissioner's motion for summary judgment filed February 5, 2018.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2018).

*II. Facts*

Otey was born in 1962, (R. at 43, 187, 204), which classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d) at the time of the ALJ's decision. Otey has a high-school education and past work experience as a clerical worker and a metal sorter in a recycling plant, a grocery store meat department manager, a welder and a quality control worker at a semi-trailer manufacturer. (R. at 46-50, 208, 226.) At her June 21, 2016, hearing, Otey testified that she stopped working in 2011 because she could not get out of bed 10 to 12 days monthly due to the "craziness in [her] head," including having auditory and visual hallucinations, which began after her son died. (R. at 50-53.) She stated that the "craziness" made her drink, but that she had not consumed alcohol since June 2014. (R. at 51-52.)

Otey also testified that she experienced crying spells very often, which sometimes lasted a day or longer. (R. at 55.) She testified that she had experienced suicidal ideations, but had not attempted suicide. (R. at 55.) She stated that she often experienced panic attacks, stating that she could not go to the store because she would get scared and shaky when she was around others. (R. at 56-57.) Otey stated that quitting drinking had not improved these symptoms. (R. at 57.) Otey stated that she used to be athletic and work on her farm, but she had not been able to do these things in a long time. (R. at 57.) She testified that depression, anxiety and post-traumatic stress disorder, ("PTSD"), were her worst problems. (R. at 57.)

Otey also testified that she suffered from constant lower back pain. (R. at 57-58.) She stated that she had undergone lap band surgery and breast reduction surgery in an attempt to alleviate this back pain, but the surgeries did not help. (R.

at 58.) She could not identify any triggers for the back pain, and she stated that nothing helped to alleviate it. (R. at 58-59.) Otey stated that she had received injections in her back, but they helped for only a couple of months. (R. at 60.) Otey further testified that she had sciatica, mostly in the right leg, but sometimes in the left leg, which radiated almost to her ankle. (R. at 59.) She testified that her doctor had not prescribed any medication for this. (R. at 59.) Otey testified that her back pain prevented her from doing anything around her house. (R. at 60.) She testified that she did not walk "too good" due to her pain and that climbing stairs "hurt [her]." (R. at 61.) However, she stated that she did not use a cane. (R. at 61.) She estimated that she could walk between 50 and 100 yards before having to sit down or change position and that she could stand for only a few minutes before having to sit down. (R. at 61-62.) Otey testified that she could not bend over at the waist, but that she could lift and carry five pounds and sit for about 20 minutes without difficulty. (R. at 62-63.) Otey testified that she had to lie down eight hours daily due to the pain and "the crazy." (R. at 63.)

Otey further testified that she had problems with her left shoulder and had been told by an orthopedic surgeon that something was torn which would heal on its own. (R. at 64-65.) She testified that she could not reach up with her left arm and had difficulty opening and closing doors. (R. at 65-66.) She stated that she could drive a car, but drove only approximately twice monthly to the grocery store. (R. at 66, 73.) She testified that because grocery lists confused her, she usually only picked up a few items at a time. (R. at 74.) Otey testified that she had undergone left knee surgery and still had difficulty both climbing and descending stairs. (R. at 66.) She further testified that she had undergone carpal tunnel surgery on her right wrist, which was not as strong as it used to be. (R. at 67-68.)

Otey testified that she sometimes watched soap operas, but had difficulty keeping up with the storylines. (R. at 72.) She stated that, although she had alpacas, she only went to her farm once or twice monthly, and when she did go, her husband drove her while she stayed in the truck. (R. at 72-73.) Otey testified that her mother-in-law and husband took care of the household chores. (R. at 71-72.) She stated that she could not make herself a sandwich or use the microwave. (R. at 74-75.) Otey testified that she had no pets, and she engaged in no hobbies. (R. at 75.)

Asheley Wells, a vocational expert, also was present and testified at Otey's hearing. (R. at 75-78.) Wells classified Otey's past work as a welder as medium[4] and skilled, as a salvage yard laborer as medium and unskilled, as an assistant manager as light and skilled and as a receptionist as sedentary[5] and semi-skilled. (R. at 76-77.) Wells was asked to consider a hypothetical individual of Otey's age, education and work history, who could perform simple, routine light work that did not require more than occasional crawling, crouching, kneeling, stooping and climbing of stairs and ramps, that did not require climbing of ladders, ropes or scaffolds and that did not require more than occasional interaction with the public. (R. at 77.) Wells testified that such an individual could not perform Otey's past work, but could perform other work existing in significant numbers in the national economy, including jobs as a packing line worker, a night cleaner and an

---

[4] Medium work involves lifting items weighing up to 50 pounds and frequently lifting and carrying items weighing up to 25 pounds. If someone can do medium work, she also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2018).

[5] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2018).

assembler. (R. at 77-78.) Wells was next asked to consider the same individual, but who also could have no more than occasional interaction with co-workers and supervisors. (R. at 78.) Wells testified that this individual could perform the jobs previously listed. (R. at 78.) Next, Wells was asked to consider the same hypothetical individual, but who also would be off task approximately 20 percent of the workday. (R. at 78.) Wells testified that such an individual could not perform any work. (R. at 78.)

In rendering his decision, the ALJ reviewed records from state agency psychologist Howard S. Leizer, Ph.D.; James Wickham, a state agency consultant; state agency psychologist Linda Dougherty, Ph.D.; state agency physician Dr. R.S. Kadian, M.D.; Dr. Laramie C. Triplett, M.D., with Magnolia Family Medicine; Wellmont Bristol Regional Medical Center; Dr. Maria Abeleda, M.D., a psychiatrist with Highlands Community Services; and Blue Ridge Orthopedics and Sports Medicine.

Otey presented to the emergency department at Wellmont Bristol Regional Medical Center on October 24, 2011, with symptoms of severe depression, complicated by significant alcohol intake and an unknown quantity of medications. (R. at 348-61.) Otey reported that he had always been depressed and that her 19-year-old son had committed suicide five years previously. (R. at 349, 351, 356.) She also reported the recent death of a close friend. (R. at 349, 356.) Otey reported that she tended to binge drink every four to six weeks. (R. at 349.) Toxicology reports showed that Otey's blood alcohol level was 329 mg/dL. (R. at 388.) Dr. William Anthony Rafuls, M.D., diagnosed depression, not otherwise specified; chronic back pain; osteoarthritis; gastroesophageal reflux disease; unresolved grief over the death of her son; and chronic pain. (R. at 353.) Her then-current Global

Assessment of Functioning, ("GAF"),[6] score was assessed 25.[7] (R. at 354.) She received individual and group therapy, and she demonstrated significant improvement in all depressive symptoms. (R. at 349.) Otey was discharged on October 26, 2011, with a normal mental status and good prognosis. (R. at 350.)

Otey treated with Dr. Laramie C. Triplett, M.D., at Magnolia Family Medicine, from October 2011 through April 2012. (R. at 286-301.) On October 12, 2011, Otey complained of worsening depression, as well as low back pain and achy and crampy legs. (R. at 293-94.) Otey was in no acute distress, and she exhibited no tenderness of the spine, ribs or pelvis. (R. at 294.) She had mildly reduced extension and full flexion, mildly reduced lateral motion, bilaterally, and normal rotation in her spine, ribs and pelvis. (R. at 294.) Deep tendon reflexes were 2+/4+ and symmetrical throughout, and straight leg raise testing was negative bilaterally. (R. at 294.) Otey was fully oriented, she appeared depressed, and recent and remote memory were intact. (R. at 294.) Dr. Triplett diagnosed depression, sacroiliac, ("SI"), pain and malaise and fatigue. (R. at 294.) He changed Otey's antidepressant medication, and he prescribed medication for Otey's back pain. (R. at 294.)

On December 8, 2011, Otey reported minimal alcohol consumption. (R. at 289.) She denied fatigue, and she voiced no muscular complaints, but she reported that her knees hurt at times and that she experienced left sciatica. (R. at 289-90.)

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health—illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by hallucinations or delusions OR serious impairment in communication or judgment … OR inability to function in almost all areas. …" DSM-IV at 32.

She stated that an SI joint injection had helped for approximately three months, but she did not want another one. (R. at 290.) Otey reported being hospitalized earlier that year for depression. (R. at 290.) She stated that her medications were adjusted at that time and that she felt "quite well." (R. at 290.) Otey was in no acute distress, and deep tendon reflexes were 2+/4+ and symmetrical throughout. (R. at 291.) She was fully oriented, she had an appropriate mood and affect, and recent and remote memory were intact. (R. at 291.) Dr. Triplett diagnosed dysthymic disorder and SI pain, among other things, and Otey was prescribed medications. (R. at 291.)

On April 17, 2012, Otey returned to Dr. Triplett with continued complaints of being very anxious at times, as well as low back pain with sciatica in the left leg. (R. at 286-88.) She reported that the back and leg pain was so bad recently after she worked in her yard that she could not walk. (R. at 286.) She again stated her belief that the previous sacroiliac joint injection did not sufficiently relieve her pain to warrant another one. (R. at 286.) Otey was in no acute distress. (R. at 287.) Straight leg raise testing was positive on the left from the supine position. (R. at 287.) Deep tendon reflexes were 2+/4+ and symmetrical throughout. (R. at 287.) Otey was fully oriented, her mood and affect were appropriate, and recent and remote memory were intact. (R. at 287-88.) Dr. Triplett diagnosed chronic, but stable, dysthymic disorder; and persistent sciatica. (R. at 288.) He prescribed clonazepam for anxiety, and he ordered x-rays of the lumbar spine. (R. at 288.)

On June 6, 2012, Otey underwent lumbar facet injections at the L4-L5 level, bilaterally, without complication. (R. at 295-96.) However, she reported worsened pain after the injections. (R. at 296.)

Otey presented to the emergency department at Wellmont Bristol Regional Medical Center on December 23, 2012, with complaints of depression and symptoms of alcohol dependence. (R. at 319-42.) At the time of admission, Otey had been drinking heavily for seven days. (R. at 320.) She reported a very long history of binge drinking, and she stated that she "could drink a box of wine per day." (R. at 324.) She reported some brief visual hallucinations and poor concentration. (R. at 320, 322.) Otey stated that she stopped working two years previously to take care of her two children at home. (R. at 322.) She further reported that this time of year was the anniversary of her oldest son's death six years previously. (R. at 322.) On admission, Otey's mental status examination was significant for some anxious behaviors of rocking back and forth with some psychomotor retardation and depressed mood. (R. at 320.) She had a flat affect. (R. at 320.) Her blood alcohol level was 0.205. (R. at 320.) A musculoskeletal exam revealed a full range of motion in all extremities with no edema or tenderness. (R. at 328.) Otey was voluntarily admitted to Ridgeview Pavilion and placed on an alcohol detoxification protocol. (R. at 320.) In addition to her regular medications, Otey received Seroquel and, upon discharge, she received Campral for alcohol cravings. (R. at 321.) While at Ridgeview, Otey received group and individual therapy and displayed improved insight and coping skills. (R. at 320.) Otey had sufficiently stabilized by December 28, 2012, and was discharged home. (R. at 320.) Upon discharge, Otey was diagnosed with bipolar disorder type 2, most recent episode depressed, and alcohol abuse, among other conditions. (R. at 320.) A GAF score of 55[8] was assessed at discharge. (R. at 320.) Otey was scheduled for mental health therapy at Highlands Community Services. (R. at 321.)

---

[8] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Otey saw Dr. Maria Abeleda, M.D., a psychiatrist, at Highlands Community
Services, from February to July 2013. (R. at 400-01, 409-17.) Over this time,
Otey's complaints included continued mood swings, difficulty sleeping, racing
thoughts, visual and olfactory hallucinations, anxiety and worry, difficulty
concentrating, low energy and crying spells. (R. at 400-01, 409, 412-13, 415-16.)
In February, April and July 2013, she denied craving or consuming alcohol, but in
June 2013, Otey stated that she occasionally drank wine. (R. at 400, 409, 412,
415.) Physical examinations consistently revealed that Otey had good eye contact,
no tics or abnormal movements, a normal and steady gait and that she ambulated
without assistance. (R. at 400-01, 409, 413, 415.) Mental status examinations
consistently revealed that Otey was engaged, cooperative, attentive and amiable
and that her thought processes were linear, logical and coherent. (R. at 401, 409,
413, 416.) She denied suicidal and homicidal ideations, and her fund of knowledge
was adequate and insight was fair. (R. at 401, 409-10, 413, 416.) Some racing
thoughts were noted, as was difficulty with attention span and concentration. (R. at
401, 409-10, 413, 416.) Otey's mood ranged from tearful, depressed, dysphoric
and dysthymic in February and April 2013, to bright, stable and cheerful in June
and July 2013. (R. at 401, 410, 413, 416.) Otey consistently reported that
medications helped her symptoms. (R. at 400, 409, 415.) By July 19, 2013, Otey
reported that she was doing much better. (R. at 400.) In June and July 2013, she
reported taking care of her alpacas, which she enjoyed. (R. at 400, 415.) Her
moods were stable, and she reported sleeping better. (R. at 400.) She was coping
well with racing thoughts, and BuSpar had improved her anxiety symptoms. (R. at
400.) Over this time, Dr. Abeleda diagnosed Otey with unstable bipolar I disorder,
mixed, with psychosis; and unstable PTSD, but by July 2013, she noted that the
bipolar disorder and PTSD were no longer unstable, but improved. (R. at 401, 410,
413, 416.) Dr. Abeleda also diagnosed alcohol abuse and dependence in early

remission. (R. at 401, 416.) She prescribed various medications, including BuSpar, Pristiq, Lamictal, Latuda and Campral. (R. at 410, 413, 417.)

Otey was admitted to Wellmont Bristol Regional Medical Center on August 9, 2013, after presenting to the emergency department with an altered level of consciousness. (R. at 302-18.) Despite being described as lethargic and confused, she was oriented to person and place, cooperative and fully verbal, and her mental status was deemed to be within normal limits. (R. at 303-04.) She admitted drinking alcohol while driving home and did not remember anything after arriving home. (R. at 304.) A witness observed Otey drive her vehicle into a parked car in her driveway, and EMS was called when Otey did not get out of her vehicle for a long period. (R. at 304.) She denied suicidal or homicidal ideations. (R. at 304.) A neurological examination was within normal limits. (R. at 304.) A musculoskeletal examination revealed no extremity tenderness and a normal range of motion. (R. at 308-09.) Her mood and affect were normal. (R. at 309.) A CT scan of Otey's head was normal. (R. at 316-17.) She was diagnosed with acute alcohol intoxication and altered mental status. (R. at 309, 312.)

Otey continued to receive treatment from Highlands Community Services from September to December 2013. (R. at 393-97, 401-07.) With the exception of the September 20, 2013, visit, Otey was doing well over this time period. On September 20, 2013, Otey reported that she was moody, depressed and anxious and worrying constantly about a real estate issue. (R. at 406-08.) She reported not sleeping well and an inability to concentrate. (R. at 406.) Otey stated that she did not feel like her medications were helping her. (R. at 406.) Nonetheless, she denied suicidal or homicidal thoughts, and she reported taking care of her animals. (R. at 406.) Otey denied alcohol abuse. (R. at 406.) On examination, Otey made good eye

contact, and she was calm and relaxed with no tics or abnormal movements. (R. at 407.) Her gait was normal and steady, and she could ambulate without assistance. (R. at 407.) Otey was well engaged, cooperative, attentive, amiable and spontaneous with normal speech. (R. at 407.) She had a depressed, anxious and dysphoric mood and a dysthymic, full and congruent affect without labile thinking. (R. at 407.) Thought processes were linear, logical and coherent without looseness of associations or flight of ideas, but she had some racing thoughts. (R. at 407.) Otey had no hallucinations. (R. at 407.) She was alert and oriented with an adequate fund of knowledge, intact memory, fair insight and difficult attention span and concentration. (R. at 407.) Dr. Abeleda diagnosed unstable Bipolar I disorder, mixed, with psychosis; relapsed PTSD; and alcohol abuse and dependence in early remission. (R. at 407.)

By October 7, 2013, Otey reported that she was doing very well and felt better on Risperdal. (R. at 403-05.) She reported more energy, but stated she continued to have mild mood swings and mild depression, but was better able to cope. (R. at 403.) Otey denied craving or drinking alcohol. (R. at 403.) She reported sleeping well, but this could be erratic. (R. at 403.) Otey denied suicidal or homicidal ideations, and she reported taking care of her animals. (R. at 403.) She reported that BuSpar had helped her anxiety. (R. at 403.) Otey's examination was largely unremarkable, including a normal and steady gait and an ability to ambulate without assistance. (R. at 404.) Her mood was bright, cheerful and stable, and her affect was euthymic, full and congruent without labile thinking. (R. at 404.) Thought processes were linear, logical and coherent without looseness of associations or flight of ideas, and she had no racing thoughts. (R. at 404.) Otey had no suicidal or homicidal ideations and no hallucinations. (R. at 404.) She was alert and oriented with an adequate fund of knowledge, intact memory, fair insight

and adequate attention span and concentration. (R. at 404.) Dr. Abeleda diagnosed improved bipolar I disorder, mixed, with psychosis; improved PTSD; and alcohol abuse and dependence in early remission. (R. at 404.)

On December 18, 2013, Otey saw Vicki Frasier, a qualified mental health professional, ("QMHP"), at Highlands Community Services for a Clinical Assessment. (R. at 393-99.) Otey reported that her son had passed away in December 2005 and that she had severe depression, emotionality and grief. (R. at 393-94.) She reported moderate fatigue or low energy, poor concentration, mood swings, anxiety, phobias, paranoid ideation, social isolation, guilt, appetite disturbance, agitation, conduct problems, hopelessness, worthlessness and dissociate state and mild delusions, hyperactivity, psychomotor retardation, poor grooming, irritability, panic attacks, limited social skills and elevated mood. (R. at 394.) Otey stated that she made lists to help her remember things, but she was unable to follow the lists on some days. (R. at 395.) She reported constant mood swings, but she stated that BuSpar helped to calm her agitation. (R. at 395.) She reported a history of auditory, visual and olfactory hallucinations, but she denied hallucinations while drinking alcohol. (R. at 395.) Otey denied suicidal or homicidal ideations. (R. at 395.) While she denied then-currently using alcohol, Otey stated that she drank "10 out of 30 days" and sometimes drank to intoxication. (R. at 395.) Based upon this assessment, Otey agreed to case management services, seeing a psychiatrist to manage and continue to prescribe psychotropic medications, undergoing substance abuse treatment and receiving therapy for grief and past abuse issues. (R. at 397.)

When Otey returned to Dr. Abeleda two days later on December 20, 2013, she reported doing "very well," stating that she felt on "even keel" and was

"coping well." (R. at 418-20.) Her moods were stable, and she was sleeping well. (R. at 418.) Otey denied alcohol cravings or abuse. (R. at 418.) She reported some anxiety and tending to worry about things. (R. at 418.) Otey reported that, although BuSpar had helped, she had reduced her dosage because it made her drowsy. (R. at 418.) Otey reported staying busy with chores, including taking care of her animals, and that she had more energy. (R. at 418.) She denied suicidal or homicidal thoughts. (R. at 418.) On examination, Otey had good eye contact, and she was calm and relaxed with no tics or abnormal movements. (R. at 418.) Her gait was normal and steady, and she ambulated without assistance. (R. at 418.) Otey was open and well engaged, cooperative, attentive, amiable, spontaneous, calm and relaxed with normal speech. (R. at 419.) Her mood was bright, stable and cheerful with a euthymic, full and congruent affect with no lability of thinking. (R. at 419.) Thought processes were linear, logical and coherent without looseness of associations or flight of ideas, and she had no racing thoughts. (R. at 419.) She denied suicidal or homicidal ideations, as well as hallucinations. (R. at 419.) Otey was alert and oriented, she had an adequate fund of knowledge, intact memory, fair insight and adequate attention span and concentration. (R. at 419.) Dr. Abeleda diagnosed improved Bipolar I disorder, mixed, with psychosis; improved PTSD; and alcohol abuse and dependence in early remission. (R. at 419.)

When Otey returned to Dr. Triplett on February 11, 2014, she reported that she had stopped drinking about six months previously. (R. at 446-50.) She described her health since her last visit as "fair." (R. at 446.) Otey reported "[s]ciatica in both … legs," which was worse at night or when sitting for very long, and which radiated to the ankle in the right leg and to the knee in the left leg. (R. at 446.) Otey had undergone two epidural steroid injections, the first of which, she said, helped for a few months, but the second one did not help as much. (R. at

446.) On physical examination, Otey was alert and in no acute distress. (R. at 448.) Flexion of the lumbosacral spine was not restricted, but was painful, extension was restricted, left lateral flexion was not restricted, but was painful, and right lateral flexion was not restricted, but was painful. (R. at 448.) Rotation both to the left and right were not restricted and were painless. (R. at 448.) Straight leg raise testing was negative, and deep tendon reflexes were 2+ and symmetric. (R. at 448.) Otey was oriented with a normal mood and affect, but she seemed distracted at times. (R. at 448.) Dr. Triplett diagnosed Otey with sciatica. (R. at 450.) He prescribed naproxen sodium, and he ordered x-rays of Otey's SI joints. (R. at 448, 450.) These x-rays, taken on February 11, 2014, showed that the sacrum was intact, the SI joints were normal bilaterally, and no other bony or soft tissue abnormalities were noted. (R. at 422.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Otey on March 19, 2014, finding that she was moderately restricted in her activities of daily living, had moderate difficulties in maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of extended-duration decompensation. (R. at 86.) Leizer stated that the records documented a history of depression and anxiety symptom exacerbation with alcohol abuse/dependence. (R. at 86.) Leizer noted that the medical records indicated that Otey's conditions were stable with treatment compliance, she had undergone no hospitalizations within the previous year, and she had never had any of extended duration. (R. at 86.) Leizer concluded that Otey was capable of performing unskilled work with limited social interaction. (R. at 86.)

Leizer also completed a mental residual functional capacity of Otey on the same day. (R. at 89-91.) He found that she was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerance, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 89-90.) Leizer elaborated that these restrictions were due to affective, anxiety and substance abuse disorder symptoms. (R. at 90.) However, he again concluded that Otey remained capable of unskilled work with limited social interaction. (R. at 90.)

Also on March 19, 2014, James Wickham, a state agency consultant, completed a physical residual functional capacity assessment of Otey, finding that she could perform light work. (R. at 87-89.) He found that she had an unlimited ability to balance and that she could occasionally climb ramps and stairs, climb ladders, ropes and scaffolds, stoop, kneel, crouch and crawl. (R. at 88.) Specifically, Wickham found that Otey would be so limited due to sciatica, SI pain and a body mass index of 32. (R. at 88.) No visual, communicative or environmental limitations were noted. (R. at 89.)

Otey continued to treat with Dr. Abeleda from March 2014 through August 2014. (R. at 435-69.) In March and June 2014, she reported that she was not doing well, with complaints of depression, being unmotivated, having difficulty concentrating, not sleeping well and having racing thoughts. (R. at 435.) In June 2014, Otey also reported that she was beginning to have auditory and visual

hallucinations again. (R. at 467.) She reported medication compliance and denied alcohol cravings or abuse. (R. at 435, 467.) Otey denied suicidal or homicidal ideations. (R. at 435, 467.) She reported that she continued to care for her animals. (R. at 435, 467.) Physical examinations in both March and June 2014 were largely unremarkable, including no tics or abnormal movements, a normal and steady gait and the ability to ambulate unassisted. (R. at 435, 467-68.) Mental status examinations also were normal, for the most part, including engaged, cooperative and attentive behavior, linear, logical and coherent thought processes, an adequate fund of knowledge, fair insight and adequate attention span and concentration. (R. at 435-36, 468.) Otey's mood was described as depressed, dysphoric and dysthymic. (R. at 436, 468.) On March 21, 2014, Dr. Abeleda diagnosed unstable bipolar I disorder, mixed, with psychosis; improved PTSD; and alcohol abuse and dependence in early remission. (R. at 436.) On June 20, 2014, she continued to diagnose improved bipolar I disorder, and she diagnosed PTSD and moderate alcohol use disorder. (R. at 468.) Dr. Abeleda adjusted Otey's medications. (R. at 436, 468.)

By the time Otey saw Dr. Abeleda in both July and August 2014, she reported doing well. (R. at 461-66.) Nonetheless, on July 18, 2014, she reported a drinking bout on June 27, during which she drank a pint of bourbon, and which was triggered by visiting her son's and her parents' graves the previous day. (R. at 464.) Otey also reported mood swings and having bad days about 10 days out of the month, but only five good days each month. (R. at 464.) She also reported difficulty concentrating at times and being anxious in crowds. (R. at 464.) Otey stated that she had a good relationship with her two sons at home, ages 14 and 20. (R. at 464.) In both July and August 2014, she denied alcohol cravings, and she reported medication compliance. (R. at 461, 464.) She also denied suicidal or

homicidal ideations, as well as hallucinations, noting that Trileptal had helped. (R. at 461, 464.) Otey also reported working on her farm and taking care of her alpacas. (R. at 461, 464.) By August 2014, Otey reported good sleep and appetite and good energy level. (R. at 461.) She denied mood swings. (R. at 461.) In both July and August 2014, Otey's physical examination remained unremarkable, including a normal and steady gait and an ability to ambulate unassisted. (R. at 461, 464.) Mental status examination also remained normal, including linear, logical and coherent thought processes, an adequate fund of knowledge, intact memory, fair insight and judgment and adequate attention span and concentration. (R. at 462, 465.) In June 2014, Otey's mood was described as depressed, dysphoric and dysthymic with moods swings, but by August 2014, it was described as only mildly dysphoric. (R. at 462, 465.) In June 2014, Dr. Abeleda diagnosed unstable bipolar I disorder, mixed, with psychosis; improved PTSD; and alcohol abuse and dependence in early remission, and she increased Otey's dosages of Risperdal and Trileptal. (R. at 465.) In August 2014, she diagnosed improved bipolar I disorder; improved PTSD; and alcohol abuse and dependence in early remission. (R. at 462, 465.) Dr. Abeleda noted that Otey was improved and stabilizing. (R. at 462.)

On August 28, 2014, Dr. R.S. Kadian, M.D., a state agency physician, completed a physical residual functional capacity assessment of Otey, finding that she could perform light work. (R. at 101-02.) Dr. Kadian found that Otey could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ropes and scaffolds. (R. at 101-02.) Dr. Kadian imposed these limitations due to Otey's sciatica, sacroiliac pain and body mass index of 32. (R. at 102.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 102.)

On August 29, 2014, Linda Dougherty, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Otey's disability claim. (R. at 98-100.) Dougherty found that Otey was moderately restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning, had moderate difficulties maintaining concentration, persistence or pace and had not experienced any episodes of extended-duration decompensation. (R. at 99.) She concluded that Otey could perform unskilled work with limited social interaction. (R. at 99.)

Dougherty also completed a mental residual functional capacity assessment of Otey, finding that she was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 102-03.) Dougherty noted that such limitations were due to affective, anxiety and substance abuse disorder symptoms. (R. at 103.) However, she concluded that Otey was capable of performing unskilled work with limited social interaction. (R. at 104.)

When Otey returned to Dr. Triplett on October 22, 2014, she complained that naproxen was not helping her back pain, but her depression had been stable since her previous visit. (R. at 441-45, 471-75.) She reported compliance with her medication regimen, and she denied any side effects. (R. at 441, 471.) Otey denied any muscle pain or weakness or lower extremity edema. (R. at 441, 471.) On

physical examination, Otey was alert and in no acute distress with a normal mood and affect. (R. at 443, 473.) Dr. Triplett diagnosed Otey with depressive disorder, not elsewhere classified; and lumbago, among other things, and he discontinued naproxen sodium. (R. at 444, 474.)

Otey returned to Dr. Abeleda from November 2014 to January 2016. On November 21, 2014, she stated that she was doing well, but noted that she might be going into a manic phase. (R. at 458-60.) She stated that she had been to the farm and taken care of the alpacas that day. (R. at 458.) She denied drinking or craving alcohol since June 2014. (R. at 458.) Otey reported erratic sleep, but good appetite and energy level. (R. at 458.) She reported being compliant with her medications, and she denied any medication side effects. (R. at 458.) She reported mood swings, which she tried to "ride out." (R. at 458.) On examination, Otey had a normal and steady gait, and she ambulated without assistance. (R. at 459.) She was upbeat and very spontaneous, fairly talkative, answered promptly and was open, cooperative and attentive. (R. at 459.) Her speech was normal. (R. at 459.) She had a mildly dysphoric mood, which was fairly bright, but she felt hyper. (R. at 459.) Her affect also was mildly dysphoric, full and congruent with thinking and without lability. (R. at 459.) Thought processes were linear, logical and coherent without looseness of associations, flight of ideas or racing thoughts. (R. at 459.) She had no suicidal or homicidal ideations or hallucinations. (R. at 459.) She was alert and oriented with an adequate fund of knowledge, intact memory, fair insight and adequate attention span and concentration. (R. at 459.) Dr. Abeleda diagnosed improved bipolar I disorder, mixed, with psychosis; improved PTSD; and alcohol abuse and dependence in early remission. (R. at 459.) She noted that Otey was improved, but fragile, and that Otey had mood swings and was prone to relapse and rapid cycling. (R. at 459.)

On December 23, 2014, Otey again saw QMHP Frasier for another Clinical Assessment, which essentially was the same as that performed in December 2013. (R. at 451-57.) She reported drinking when she became depressed, and she admitted to being an alcoholic, stating that she drinks 10 out of 30 days. (R. at 451.) She endorsed mild delusions, hyperactivity, psychomotor retardation, poor grooming, irritability, panic attacks, limited social skills and elevated mood and moderate fatigue or low energy, poor concentration, mood swings, anxiety, phobias, paranoid ideation, social isolation, guilt, appetite disturbance, agitation, conduct problems, hopelessness, worthlessness and dissociate states. (R. at 452.) She reported severe depressed mood, emotionality, grief and hallucinations. (R. at 452.) Although she preferred not to leave the house on most days, she stated that she enjoyed caring for her alpacas and was able to do this most days. (R. at 453.) She also stated that she sheered the wool for sale. (R. at 454.) She reported poor energy and poor concentration. (R. at 453.) She stated that she tried to make lists to herself remember things, but she denied that she could follow the list some days. (R. at 453.) She denied thoughts of self harm or wanting to hurt someone else. (R. at 453.)

Otey reported suffering emotional, physical and sexual abuse as a child. (R. at 454.) She reported being then-currently on probation for a 2013 DUI charge. (R. at 454-55.) She admitted to having a total of four DUI arrests and three public intoxication arrests. (R. at 455.) Otey admitted to being an alcoholic, but stated she would not attend AA meetings because "that's where you find a good drinking buddy." (R. at 455.) Otey was open to case management services, seeing a psychiatrist to manage and continue to prescribe psychotropic medications and undergoing substance abuse treatment and therapy to address grief issues and past abuse issues. (R. at 456.)

Otey returned to Dr. Abeleda on March 20, 2015, stating that she was "fine." (R. at 495-97.) She reported some crying spells, but did not wish to change her medications because she had improved much on her current regimen. (R. at 495-96.) Otey admitted to suicidal ideations, but denied plans to hurt herself. (R. at 495.) She reported that she continued to care for her alpacas, stating that she had eight of them. (R. at 495.) She denied drinking or craving alcohol, and she stated that she had been abstinent for about four months. (R. at 495.) Her sleep was described as adequate, and her appetite and energy levels were good. (R. at 495.) Otey continued to be compliant with her medications and denied side effects. (R. at 495.) She denied hearing voices or seeing things. (R. at 495.) On physical examination, she had good eye contact, as well as a normal and steady gait, and she ambulated without assistance. (R. at 496.) Her mood was depressed, dysphoric and dysthymic, with a dysphoric and blunted affect that was congruent with thinking and without lability. (R. at 496.) Thought processes were linear, logical and coherent without looseness of associations, flight of ideas or racing thoughts. (R. at 496.) Otey was alert and oriented with an adequate fund of knowledge, intact memory, fair insight and adequate attention span and concentration. (R. at 496.) Dr. Abeleda diagnosed unstable Bipolar I disorder with psychotic and mixed features; unstable PTSD; and moderate alcohol use disorder. (R. at 496.) Dr. Abeleda noted that Otey was depressed and fragile with mood swings and being prone to relapse and rapid cycling. (R. at 496.)

On April 30, 2015, Otey reported that she was fine, but stated that she had slept only two hours in the previous three nights. (R. at 498-500.) Her moods were stable, and she reported medication compliance. (R. at 498.) She reported continuing to care for her alpacas. (R. at 498.) Otey reported drinking wine for three days the previous week. (R. at 498.) She denied craving alcohol, but stated

that she easily turned to it when she had a "bad feeling." (R. at 498.) Otey denied suicidal or homicidal ideations, as well as plans to hurt herself. (R. at 498.) Otey denied hallucinations. (R. at 498.) Again, physical examination was largely unremarkable. Otey made good eye contact, and her gait was normal and steady, and she ambulated without assistance. (R. at 499.) Her mood was stable, and her affect was dysthymic and blunted, but congruent with thinking and without lability. (R. at 499.) Thought processes were linear, logical and coherent without looseness of associations, flight of ideas or racing thoughts. (R. at 499.) She was alert and oriented with an adequate fund of knowledge, intact memory, fair insight and adequate attention span and concentration. (R. at 499.) Dr. Abeleda diagnosed unstable bipolar I disorder, with psychotic and mixed features; unstable PTSD; and moderate alcohol use disorder. (R. at 499.) She discontinued Trileptal. (R. at 499.)

On May 15, 2015, Otey returned to Dr. Abeleda stating that she was "fine." (R. at 501.) She reported not having consumed alcohol in the prior two weeks and that her moods were stable. (R. at 501.) She reported medication compliance. (R. at 501.) She had no suicidal or homicidal plans, and she denied hallucinations. (R. at 502.) Physical examination remained unremarkable. Otey had good eye contact, she was calm and relaxed, and she had no tics or abnormal movements. (R. at 502.) She was cooperative and attentive. (R. at 502.) Her mood was stable, and she was smiling and cheerful. (R. at 502.) Her affect was euthymic, full and congruent with thinking and without lability. (R. at 502.) Thought processes were linear, logical and coherent without looseness of associations, flight of ideas or racing thoughts. (R. at 502.) She stated that she felt stable, except for shallow sleep. (R. at 502.) Otey was alert and oriented with an adequate fund of knowledge, intact memory, fair insight and adequate attention span and concentration. (R. at 502.) Dr. Abeleda diagnosed unstable, bipolar I disorder, with psychotic and mixed features; unstable

PTSD; and moderate alcohol use disorder. (R. at 502.) Dr. Abeleda stated that Otey was stabilizing, but fragile, and had mood swings and was prone to rapid cycling. (R. at 502.) Otey reported that she felt she was in control and functioning and able to care for her son and her farm. (R. at 502.) Dr. Abeleda adjusted Otey's medications and referred her to counseling. (R. at 502.)

On August 21, 2015, Otey reported continued mood swings and not wanting to get out of bed some days. (R. at 504-06.) Nonetheless, she reported not sleeping for three or four days at times. (R. at 504.) She denied drinking alcohol. (R. at 504.) Otey reported more depressed days than "up" days. (R. at 504.) She reported that she had not been to her farm in "some weeks." (R. at 504.) Otey agreed to change her medications for better mood stabilization. (R. at 504.) She denied suicidal ideations or plans of hurting herself, as well as hallucinations. (R. at 505.) She stopped taking Trazodone because it did not help her sleep, and she stated she took Campral for alcohol cravings at times. (R. at 504.) Otey's examination remained largely normal. Her gait was normal and steady, and she ambulated without assistance. (R. at 505.) Her mood was bland and dysthymic with mood swings. (R. at 505.) Her affect was dysthymic and blunted and congruent with thinking and without lability. (R. at 505.) Thought processes were linear, logical and coherent with no looseness of associations, flight of ideas or racing thoughts. (R. at 505.) Otey had frequent mood swings, mostly depressed, and shallow erratic sleep. (R. at 505.) She was alert and oriented with an adequate fund of knowledge, intact memory, fair insight and adequate attention span and concentration. (R. at 505.) Dr. Abeleda diagnosed unstable bipolar I disorder, with psychotic and mixed features; unstable PTSD; and moderate alcohol use disorder. (R. at 505.) She concluded that Otey continued to have mood swings and was unstable and fragile.

(R. at 505.) Dr. Abeleda further found that Otey was prone to relapse and rapid cycling. (R. at 505.) Risperdal and Trazodone were discontinued. (R. at 505.)

On September 24, 2015, Otey reported that she was depressed and not motivated to do anything. (R. at 507-09.) She reported having marital problems, but did not want to discuss it. (R. at 507.) She stated that Abilify was not doing much to help her. (R. at 507.) Although Otey denied drinking or craving alcohol, she also stated that she took Campral for alcohol cravings at times. (R. at 507.) She again reported that she had not been to her farm in "some weeks." (R. at 507.) She again agreed to adjust her medications for mood stabilization. (R. at 507.) Otey denied suicidal ideations or plans of hurting herself, as well as hallucinations. (R. at 508.) Otey declined going to counseling and said she would continue with a support group. (R. at 507.) Otey's examination remained unchanged, for the most part. (R. at 508.) Her mood was depressed, tearful and dysthymic, and she had mood swings and was angry at herself at times. (R. at 508.) Her affect was dysthymic, dysphoric, full and congruent with thinking and with lability. (R. at 508.) Dr. Abeleda's diagnoses of Otey also remained unchanged. (R. at 508.)

On November 17, 2015, Otey returned to Dr. Abeleda, stating that she was "so-so." (R. at 510-12.) She was not as depressed, and she and her husband were getting along better. (R. at 510.) Otey continued to have mood swings. (R. at 510.) Although she noted being sleepless for a few days, then oversleeping for a couple of days, she was not as manic as she had been. (R. at 510.) She denied drinking or craving alcohol. (R. at 510.) She denied suicidal ideations or plans to hurt herself, as well as hallucinations. (R. at 510.) Otey's examination was unchanged, for the most part. (R. at 511.) She had a normal and steady gait. (R. at 511.) Her mood was dysthymic with mood swings, and she was angry at herself at times. (R. at 511.)

Otey's affect was dysthymic, dysphoric, full and congruent with thinking and without lability. (R. at 511.) Otey's attention span and concentration were deemed adequate. (R. at 511.) Her diagnoses again remained unchanged. (R. at 511.)

On January 15, 2016, Otey returned to Dr. Abeleda, reporting that she was sleeping well, but was feeling rather anxious, and could not explain it. (R. at 513-16.) She had been stable throughout most of the previous two months. (R. at 513.) Otey was not depressed, and she reported that she and her husband were getting along better. (R. at 513.) She was not as manic as she had been. (R. at 513.) Otey reported that she did not crave alcohol all the time, but easily turned to it when she had a "bad feeling." (R. at 513.) She denied suicidal ideations and plans to hurt herself, as well as hallucinations. (R. at 513.) Otey's examination remained largely unchanged. (R. at 514.) She continued to have a normal and steady gait and did not need assistance to ambulate. (R. at 514.) Her mood was dysthymic, with mood swings and mild anxiety, while her affect was dysthymic, dysphoric, full and congruent with thinking and without lability. (R. at 514.) Her attention span and concentration were adequate. (R. at 514.) Otey's diagnoses remained unchanged. (R. at 514.) Dr. Abeleda noted that Otey had mood swings and was unstable and fragile and prone to relapse and rapid cycling. (R. at 514.) Her dosage of Abilify was increased. (R. at 515.)

An x-ray of Otey's left shoulder, dated February 8, 2016, showed mild degenerative changes affecting the distal clavicle and adjacent acromion articular surface. (R. at 485.) There was no acute fracture or subluxation. (R. at 485.)

Otey saw Jacqueline L. Greene, a nurse practitioner at Blue Ridge Orthopedics and Sports Medicine, on February 10, 2016, with complaints of left

shoulder pain and dysfunction after falling in her shower four days previously. (R. at 527-28.) Oh physical examination, Otey's left shoulder was bruised over the anterior portion with mild bruising over the anterior portion of the chest and a bruise over the right anterior shoulder. (R. at 528.) She had virtually no ability to lift the arm in any direction, and when raised passively, she could not hold it in a raised position, and she could not reach behind her back. (R. at 528.) She had full range of motion of the elbow, wrist and fingers, but her grip strength was decreased on the left. (R. at 528.) X-rays showed no acute bony abnormality or dislocation, and Otey was diagnosed with left shoulder internal derangement. (R. at 528.) Dr. Triplett ordered a left shoulder MRI, he placed her in a sling, and he prescribed hydrocodone. (R. at 528.) An MRI, dated February 26, 2016, showed a low-grade distal articular surface tear involving the posterior most fibers of the infraspinatus adjacent to the humeral footplate; localized increased intrasubstance signal within the teres minor which was intact, most likely indicative of a mild strain; and increased intrasubstance signal within the inferior aspect of the supraspinatus, probably indicative of a low-grade strain. (R. at 530-31.)

Otey returned to Dr. Abeleda on March 18, 2016, stating that she was "ok" and reporting continued mild mood swings and erratic sleep. (R. at 491-93.) Otey stated that she had been to her farm twice that week. (R. at 491.) She reported medication compliance and denied side effects. (R. at 491.) Otey stated she was not as depressed, but still did not feel great, and she reported that she and her husband were getting along well. (R. at 491.) She was not as manic as she had been. (R. at 491.) She denied drinking or craving alcohol. (R. at 491.) She denied suicidal ideations and plans of hurting herself, as well as hallucinations. (R. at 491.) Her physical examination remained unchanged, for the most part. (R. at 492.) She had a normal and steady gait, and she could ambulate without assistance. (R. at

492.) Her mood was dysthymic, and she had mood swings and mild anxiety. (R. at 492.) Her affect was dysthymic and full with congruent thinking and without lability. (R. at 492.) Otey's attention span and concentration were deemed adequate. (R. at 492.) Dr. Abeleda continued to diagnose bipolar I disorder with psychotic and mixed features, unstable; PTSD, unstable; and moderate alcohol use disorder. (R. at 492.) She noted that Otey had mood swings and was still unstable and quite fragile. (R. at 492.) She had erratic sleep and was prone to relapse and rapid cycling. (R. at 492.)

Otey returned to Dr. Triplett on March 21, 2016, with continued complaints of pain in her left shoulder. (R. at 487-90.) She reported that x-rays, taken at the time, showed some minor arthritis, and an MRI showed some partial tears of the infraspinatus and some strains. (R. at 487.) Otey still had some bruising in the left upper arm and some pain and limited range of motion. (R. at 487.) Otey reported that she had just begun to be able to abduct the arm over the previous few days. (R. at 487.) She continued to have pain and weakness when trying to put things in and out of the oven, refrigerator, but she had no difficulty flexing the elbow. (R. at 487.) She reported having been given hydrocodone, but not taking them because they were of limited benefit and caused mild adverse effect. (R. at 487.) Otey reported joint pain, limb pain an limb swelling, as well as anxiety and depression. (R. at 487.) On physical examination, Otey was alert and in no acute distress. (R. at 489.) The left shoulder was normal in appearance, and the left upper arm had ecchymosis and mass effect with mild to moderate tenderness. (R. at 489.) She had abduction to approximately 90 degrees, forward flexion to approximately 90 degrees and a mild decrease in internal rotation. (R. at 489.) Dr. Triplett diagnosed Otey with acute pain of the left shoulder and internal derangement of the left shoulder. (R. at 490.) He continued her on Sulindac. (R. at 490.) Otey declined

physical therapy, stating that she would perform home exercises. (R. at 490.) They also discussed repeat x-rays, particularly of the humerus, but she refused. (R. at 490.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2018).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Otey argues that substantial evidence does not exist to support the ALJ's finding that she was not disabled. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-14.) In particular, Otey argues that the ALJ erred by failing to properly evaluate her lower extremity impairment. (Plaintiff's Brief at 10-12.) Otey also argues that the ALJ erred by failing to properly account for her moderate limitations in concentration, persistence and pace. (Plaintiff's Brief at 12-14.)

Otey first argues that the ALJ erred by failing to properly evaluate her lower extremity impairment. Otey argues that the ALJ erred at step two of the sequential evaluation process when he did not find that her lower extremity impairment was severe. She further argues that the ALJ erred at steps four and five of the sequential evaluation process by failing to consider her lower extremity impairment in determining her residual functional capacity and whether she could perform past work or other work. For the following reasons, I find these arguments unpersuasive. First, the Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not

significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2018). Basic work activities, in the physical context, include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying and handling. *See* 20 C.F.R. § 404.1522(b)(1) (2018). The Fourth Circuit held in *Evans v. Heckler*, that """[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.""" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted)). I find that the medical evidence of record does not support a finding that Otey's lower extremity impairment significantly limited her ability to do basic physical work activities. In April 2012, and again in February 2014, Dr. Triplett, Otey's treating physician, diagnosed sciatica. (R. at 288, 450.) However, it is well-established that a diagnosis, in and of itself, does not establish the existence of a disability. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Instead, Otey must show that the impairment results in a related loss of function. *See Gross*, 785 F.2d at 1166. This she did not.

In February 2014, Dr. Triplett prescribed naproxen sodium and ordered x-rays of Otey's SI joints, which were normal bilaterally. (R. at 422, 447, 450.) Dr. Triplett's physical examinations of Otey were mostly unremarkable, with the exception of positive straight leg raise testing on the left from the supine position on April 17, 2012, and some restricted range of motion with extension of the lumbosacral spine on February 11, 2014. (R. at 287, 447.) However, in February 2014, straight leg raise testing was negative. (R. at 447.) Dr. Triplett did not place any restrictions on Otey's physical activities. Additionally, Dr. Abeleda, Otey's treating psychiatrist, completed physical examinations at each visit. During the

course of her treatment of Otey, Dr. Abeleda consistently found that she had a normal and steady gait and could ambulate unassisted. Furthermore, when Otey was presented to Bristol Regional Medical Center on December 23, 2012, she had a full range of motion in all extremities, no extremity edema and no extremity tenderness. (R. at 328.) When she presented to Bristol Regional Medical Center on August 9, 2013, she had no extremity tenderness and a normal range of motion. (R. at 308-09.) Moreover, the state agency consultant and physician both opined that Otey could perform light work with restrictions due, in part, to sciatica. (R. at 87-89, 101-02.) They both opined that she could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. State agency consultant Wickham opined that Otey also could occasionally climb ladders, ropes and scaffolds, while Dr. Kadian opined she could never do so. (R. at 88, 101-02.) Finally, I find that Otey's own statements contradict a finding that her lower extremity impairment significantly affected her ability to perform basic work activities. More specifically, the record is replete with references to her ability to tend to several alpacas on her farm. It is for all of the above-stated reasons that I find that substantial evidence exists in the record to support the ALJ's failure to find that Otey's lower extremity impairment constituted a severe impairment under the regulations.

Otey also argues that the ALJ erred by failing to properly consider her lower extremity impairment in reaching his residual functional capacity assessment and concluding that she could perform other work. Again, I am not persuaded by Otey's argument. The ALJ found that Otey could perform simple, routine light work that required no more than occasional climbing of ramps and stairs, kneeling, stooping, crouching and crawling, that did not require climbing of ladders, ropes or scaffolds and that required no more than occasional interaction with the public, co-workers and supervisors. (R. at 24-30.) For the same reasons that substantial

evidence supports the ALJ's failure to find that Otey's lower extremity impairment constitutes a severe impairment, I now find that substantial evidence supports his physical residual functional capacity assessment and resulting conclusion that she was not disabled. As the previously cited evidence demonstrates, Otey had largely unremarkable lower extremity examinations, she was treated conservatively, her treating physician placed no restrictions on her, x-rays were normal, her own statements regarding her activities undermine a finding of disability, and the ALJ's residual functional capacity finding is supported by the opinions of Wickham and Dr. Kadian. I also note that the ALJ incorporated the more restrictive finding of Dr. Kadian, that Otey could not climb ladders, ropes or scaffolds, into his residual functional capacity finding. It is for the above-stated reasons that I find that substantial evidence supports the ALJ's residual functional capacity finding and resulting conclusion of nondisability.

Lastly, Otey argues that the ALJ erred by failing to properly account for her moderate limitations in concentration, persistence or pace in determining her mental residual functional capacity. More specifically, Otey argues that, under the reasoning set forth in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), the ALJ's residual functional capacity finding, limiting her to the performance of simple, routine light work requiring no more than occasional interaction with the public, co-workers and supervisors, did not account for her moderate limitations in concentration, persistence or pace and that the ALJ was required to conduct a function-by-function analysis. For the reasons that follow, I find that substantial evidence supports the ALJ's mental residual functional capacity finding.

In *Mascio*, the Fourth Circuit held that an ALJ does not generally account for a claimant's limitations in concentration, persistence and pace by limiting the

claimant to simple, routine tasks or unskilled work. *See* 780 F.3d at 638. The court noted that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 638; *see also Sexton v. Colvin*, 21 F. Supp. 3d 639, 642-43 (W.D. Va. 2014) (citing *Wiederholt v. Barnhart*, 121 F. App'x 833, 839 (10th Cir. 2005) (holding that a "limitation to simple, unskilled work does not necessarily" accommodate a person's difficulty in concentrating on or persisting in a task, or maintaining the pace required to complete a task). In *Mascio*, the Fourth Circuit found that the ALJ did not explain why Mascio's moderate limitation in concentration, persistence or pace did not translate into a limitation in his residual functional capacity. However, the court noted that the ALJ may find that the concentration, persistence or pace limitation would not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. *See Mascio*, 780 F.3d at 638; *see also Hutton v. Colvin*, 2015 WL 3757204, at *3 (N.D. W. Va. June 16, 2015).

*Mascio* does not broadly dictate that a claimant's moderate impairment in concentration, persistence or pace always translates into a limitation in the residual functional capacity. Rather, *Mascio* underscores the ALJ's duty to adequately review the evidence and explain the decision, especially where, as the ALJ held in *Mascio*, a claimant's concentration, persistence or pace limitation does not affect the ability to perform simple, unskilled work. The ALJ has the responsibility to address the evidence of record that supports that conclusion.

The *Mascio* court relied upon *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011), where the court rejected the argument that an ALJ

generally accounts for a claimant's limitations in concentration, persistence and pace by restricting the claimant to simple, routine tasks or unskilled work. However, the *Winschel* court explained that:

> But when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations. … Additionally, other circuits have held that hypothetical questions adequately account for a claimant's limitations in concentration, persistence, and pace when the questions otherwise implicitly account for these limitations.

631 F.3d at 1180. Courts within the Fourth Circuit have come to rely upon *Winschel's* reasoning to comply with *Mascio*. *See Gardner v. Colvin*, 2015 WL 1508835, at *8 (D. Md. Mar. 31, 2015).

The *Winschel* court relied upon several other circuits which have held that an ALJ may exclude a moderate limitation in concentration, persistence and pace from either the residual functional capacity or the hypothetical presented to the vocational expert where the evidence reflects that the claimant can perform simple, unskilled work. *See Similia v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173-76 (9th Cir. 2008); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001); *see also Wiederholt*, 121 F. App'x 833. Additionally, other courts have held that an ALJ may adequately address a claimant's limitations in concentration, persistence and pace through hypothetical questions to the vocational expert which include evidence or opinions that account for these limitations. *See e.g., Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ did not err by failing to include deficiencies in concentration,

persistence or pace where the hypothetical incorporated concrete restrictions identified by examining psychiatrist regarding quotas, complexity and stress).

For example, in *Stubbs-Danielson*, the court affirmed the residual functional capacity which limited the claimant to "simple, routine, repetitive sedentary work, requiring no interaction with the public" despite having moderate limitations in concentration, persistence or pace where the state agency reviewing psychologist found that, despite the claimant's slow pace and moderate limitations in other mental areas, she retained the ability to carry out simple tasks. 539 F.3d at 1173-76. Likewise, in *Howard*, the court explicitly rejected a claim that an ALJ's hypothetical describing an ability to do "simple, routine, repetitive work" failed to capture deficiencies in concentration, persistence or pace where the state agency psychologist concluded that the claimant, despite certain pace deficiencies, retained the ability to do simple, repetitive, routine tasks. 255 F.3d at 582.

Thus, *Mascio* reiterates the long-held proposition that substantial evidence in the record must support the limitations contained in the residual functional capacity and included in the hypothetical question to the vocational expert. An ALJ may account for a claimant's limitations in concentration, persistence or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations or other evidence that is sufficiently evident to the reviewing court.

Here, I find that ample evidence exists to support the ALJ's mental residual functional capacity finding that Otey is capable of performing simple, routine light work, requiring no more than occasional interaction with the public, co-workers

and supervisors, despite her moderate limitations in concentration, persistence or pace. In his decision, the ALJ specifically found that Otey had moderate difficulties in concentration, persistence or pace, stating his agreement with the state agency psychological consultants on this point. (R. at 24.) In arriving at Otey's residual functional capacity, the ALJ discussed a plethora of evidence, including a Function Report dated January 22, 2014. The ALJ found that this Report showed that Otey retained the cognitive ability to complete basic daily activities, all of which tended to show an acceptable ability to maintain concentration, persistence and pace. (R. at 24.) A review of this Function Report reveals that Otey stated an ability to sometimes perform light housework, to feed her animals, to watch television, to prepare frozen meals, to order take out, to drive a car, to shop in stores with short lists weekly, to count change and to handle a savings account. (R. at 236-45.) The ALJ also discussed Otey's allegations contained in the record, including, but not limited to, suffering from bipolar disorder, depression, anxiety, PTSD, symptoms of fear, crying spells, auditory and visual hallucinations following the death of her son, past thoughts of self-harm and panic attacks. (R. at 25.) The ALJ also noted Otey's testimony that she did not do any housework and, despite stating that she did not work on her farm, she also testified to accompanying her husband there at times on the weekends to care for their eight alpacas, driving about twice monthly and shopping for bread and lunchmeat at the grocery store. (R. at 25-26.)

Additionally, I note that the ALJ discussed the medical evidence of record relevant to this issue at length. Specifically, the ALJ stated that progress notes revealed multiple unremarkable psychiatric examinations, which revealed Otey being distracted at times, but she was oriented, and she had appropriate and normal mood and affect and intact memory. (R. at 26.) The ALJ further noted Otey's visit

to the psychiatric unit at Wellmont Bristol Regional Medical Center on December 23, 2012, when she had symptoms of depression and anxiety. (R. at 27.) However, mental status examinations revealed, among other things, that she was alert, fully oriented, had good eye contact, had goal directed thoughts, had okay insight and judgment and no psychosis. (R. at 27.) Additionally, the ALJ noted that, in August 2013, during a visit to the emergency department at Wellmont Bristol Regional Medical Center, a psychiatric examination was unremarkable, revealing normal mood and affect. (R. at 27.) The ALJ noted that from February 25, 2013, through March 18, 2016, during visits at Highlands Community Services Center for Behavioral Health, Otey's diagnoses included bipolar disorder with psychosis, improved; PTSD, improved; and alcohol abuse/dependence, in early remission. (R. at 27.) Progress notes revealed, among other things, poor concentration. However, on March 21, 2014, progress notes revealed that Otey reported taking care of her animals, and on August 15, 2014, notes revealed she was doing very well, being active and working on her farm taking care of her alpacas. (R. at 27.) The ALJ noted that on December 23, 2014, progress notes revealed Otey's reports of having alpacas on her farm and that she enjoyed caring for, tending to and shearing their wool to sell. (R. at 27.) According to the ALJ, progress notes revealed multiple unremarkable mental status examinations, revealing dysthymic and dysphoric mood and affect, mild anxiety and racing thoughts. (R. at 27.) The ALJ also noted that mental status examinations also revealed normal speech, linear, logical and coherent thought processes, alertness, euthymic and cheerful mood and affect otherwise, adequate fund of knowledge, intact memory, fair judgment and insight, adequate attention span and concentration, cooperativeness and well engaged behavior with no hallucinations or suicidal/homicidal ideations. (R. at 27-28.)

The ALJ also discussed the mental opinion evidence of record, stating that he was giving significant weight to the opinions of state agency psychological consultants Leizer and Dougherty. (R. at 28.) He explained that these consultants found that Otey had moderate restrictions in activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace and no episodes of decompensation of extended duration. (R. at 28.) Nonetheless, both Leizer and Dougherty found Otey remained capable of performing unskilled work with limited social interaction. (R. at 28.) The ALJ found that these opinions generally were consistent with the medical evidence of record as a whole. (R. at 28.) The ALJ noted that Otey continued to perform normal activities of daily living, including caring for alpacas, finding her testimony that she sat in her husband's truck inconsistent with her reports to her psychologist. (R. at 29.) The ALJ also noted that, although Otey denied there was a business related to these alpacas, she admitted they were storing wool in the garage because it was too expensive to process. (R. at 29.) Nonetheless, she testified that she still would not sell the wool even if the processing expenses were not an issue. (R. at 29.) The ALJ concluded that Otey did not give candid testimony. (R. at 29.) The ALJ stated that the record showed that Otey reported multiple times to her mental health providers that she and her husband were farming alpacas as a commercial operation and were shearing their wool for sale. (R. at 29.) Furthermore, mental health records from Highlands Community Services repeatedly note that she was taking care of alpacas. (R. at 29.) The ALJ concluded that, the objective record, generally, including the activities Otey reported she engaged in to healthcare providers, would support that she could perform within the limitations of the residual functional capacity finding. (R. at 29.)

It is evident to the undersigned that the ALJ thoroughly discussed the evidence of record that supports his mental residual functional capacity finding. This is not a case where the ALJ summarily concluded that a limitation to the performance of simple, routine work accounts for Otey's moderate impairment in concentration, persistence or pace without further analysis or consideration. Rather, the medical evidence discussed by the ALJ in his decision shows that Otey's mental status examinations were consistently unremarkable, for the most part, and that her own allegations support a finding that she can perform simple, routine work, despite moderate limitations in concentration, persistence or pace. Additionally, the court notes that during numerous office visits, Otey reported that she was responding well to her prescribed medication. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross*, 785 F.2d at 1166. Moreover, as the ALJ stated in his decision, there are numerous reports of Otey caring for eight alpacas on her farm.

For all of the reasons stated above, I find that the ALJ met his duty to address the evidence of record that supports his mental residual functional capacity finding. I find that the record supports this residual functional capacity finding and that this supporting evidence is evident to this court on review. Thus, I find Otey's assertion that the ALJ's mental residual functional capacity finding runs afoul of *Mascio* by failing to properly account for her limitations in concentration, persistence or pace is without merit, and I recommend that the court find the same.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Otey's leg impairment was not severe within the regulations;
2. Substantial evidence exists in the record to support the ALJ's finding with regard to Otey's physical residual functional capacity;
3. Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding; and
4. Substantial evidence exists in the record to support the Commissioner's finding that Otey was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Otey's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge

may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties at this time.

DATED:    October 29, 2018.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE